MARY MOLINA, Respondent, v GAMES MANAGEMENT SER-
VICES, Appellant, et al., Defendant.

Second Department, October 12, 1982

APPEARANCES OF COUNSEL

*Squadron, Ellenoff, Plesent & Lehrer* (*Howard M. Squadron, Neal M. Goldman* and *Eugenie C. Gavenchak* of counsel), for appellant.

*Natiss Ferenzo & Barrocas, P.C.* (*Andre L. Ferenzo* of counsel), for respondent.

OPINION OF THE COURT

O'CONNOR, J.

Plaintiff's complaint seeks $166,950, representing the first prize money for the September 6, 1980 weekly Lotto drawing of the New York State Division of the Lottery. Her causes of action, framed in bailment, "intentional deprivation", breach of contract and negligence, arise from the refusal of the independent contractor operating the Lotto game on behalf of the State (defendant Games Management Services) to honor her ticket because it was never received at Lotto Central, its processing point (21 NYCRR 2817.1). A separate cause of action asked for $1,000,000 in damages because employees of Games Management had allegedly defamed plaintiff by accusing her of cheating, in front of the employee of codefendant J's Coiffures, Inc., which had sold her the ticket as vending agent for Games Management. Punitive damages were also sought.

Plaintiff's papers on her motion to compel disclosure and Games Management's papers on its motion for summary judgment explain that plaintiff had purchased the ticket and duly complied with its instructions, which required her to select 6 numbers from the 40 available in each of two games. She returned the completed ticket with her $1 wager, and the sales agent employee stamped it with a validation number before giving her the player's copy of the ticket. After the drawing, however, Games Management refused her demand for payment upon surrender of her copy of the ticket on the ground that it had not received the original ticket from the sales vendor and had no record of the ticket on microfilm.

In relation to her bailment and negligence theories, plaintiff established through interrogatories that the sales agent had a history of unaccounted for validation numbers (viz., three in May, 1980, one in July, 1980 and two in August, 1980). Games Management, however, pointed out in its papers that the existence of unaccounted for validation numbers would not necessarily imply that validated tickets had been lost in transit between a sales agent and Lotto Central. Games Management added that unaccounted for validation numbers amounted to but one-hundredth of 1% of some 450,000 Lotto tickets microfilmed

each week on receipt at Lotto Central, and these missing numbers were usually explained away later as having been stamped on tickets voided for various reasons and not forwarded, or on tickets forwarded too late for the drawing, or as having been stamped in error by accidental activation of the validating machine.

Furthermore, according to Games Management, it was possible that a player could validate his own ticket with or without the sales agent's consent, and then destroy the original ticket, fill in his own copy *after* the drawing, and present it as a winning ticket with an excuse that the missing original ticket could be explained as mishandling by the sales agent or Lotto Central. It was just this scenario, however, that caused the Lottery Division to promulgate regulations (21 NYCRR Part 2800) that anchored the security of Lotto not upon the use of such sequentially issued validation numbers by sales agents but upon the microfilming of original tickets upon timely receipt at Lotto Central.[1]

Plaintiff moved at Special Term to compel Games Management to disclose in interrogatory numbered "13" information concerning all unaccounted for validation numbers issued by sales agents other than the codefendant prior to the drawing in question. Special Term granted the motion upon certain conditions. Although such information was clearly relevant to plaintiff's bailment and negligence theories, we deem Games Management's appeal from this order to be moot in light of our disposition of its appeal from the court's subsequent order denying its motion for summary judgment dismissing the complaint.

■ We hold that even if plaintiff's allegations are taken as true, under the rules of the game she is not entitled to legal relief apart from the refund of her $1 wager offered to her as actual damages.

It is true, as plaintiff argues, that the law disfavors agreements purporting to limit liability by excluding con-

---

1. "The basic security provided in the processing system is the requirement that for a bet to be valid, it must be recorded on microfilm prior to the draw. If a bet, for any reason whatsoever, is not recorded on microfilm prior to the draw, it is not a valid bet." (21 NYCRR 2817.18; see 21 NYCRR 2817.9 [n]; 2817.13 [a] [4]; 2817.14 [c]; 2817.15 [d].)

sequential damages and insists that any such limitation be expressed clearly and unequivocally (see *Gross v Sweet*, 49 NY2d 102, 106). It is equally true that the courts of this State will not enforce illegal contracts such as gambling debts (see General Obligations Law, § 5-401) and that plaintiff's claim can be entertained only because of the Constitution's narrowly drawn approbation of certain games conducted by governmental or nonprofit entities (see NY Const, art I, § 9). The law's disfavor of gambling claims only serves to strengthen another principle of law: regulations duly promulgated by administrative agencies, including those supervising gambling activities, have the force and effect of law and require strict compliance (see *Matter of Caplan v New York State Dept. of Taxation & Fin., Div. of Lottery*, 32 NY2d 134; *McBride v New York City Off-Track Betting Corp.*, 66 AD2d 770; *Carr v State of New York*, 15 AD2d 709, mot for lv to app den 11 NY2d 645, app dsmd 371 US 14; *Ronca v New York State Racing & Wagering Bd.*, 90 Misc 2d 324; *Hochberg v New York City Off-Track Betting Corp.*, 74 Misc 2d 471, affd 43 AD2d 910; *Mills v Roosevelt Raceway*, 66 Misc 2d 251) unless shown to be arbitrary and capricious (see *Ostrer v Schenck*, 41 NY2d 782).

The ticket used by plaintiff in the case at bar[2] clearly sets forth certain information on its reverse side regarding how to play, how to claim prizes, the prizes and the odds, and the rules and regulations governing the game. Under the boldface, uppercase caption "RULES AND REGULATIONS", are printed two numbered paragraphs. The first informs the player that submission of the ticket for validation signifies agreement to abide by the rules and regulations of the State lottery and that copies of these rules are available from certain sources, including the sales agent. The second informs the player that the sales agent acts as the *player's* agent and that the contractor (Games Management), the agent and the State are not liable beyond actual

---

**2.** An inspection of Lotto Central's microfilm records disclosed that the validation number purportedly issued to plaintiff for this ticket immediately followed in sequence the number issued to plaintiff on another ticket and the number issued to one James Molina on still another ticket.

damages (i.e., the wager) if the contractor, for whatever reason, refuses to accept a ticket.[3]

Defendant Games Management's refusal to honor plaintiff's demand for payment upon presentment of her ticket in the absence of its presence on Lotto Central's microfilm records was, therefore, the agreed-upon consequence of plaintiff's wagering not only that her selection of numbers would match the draw but also that her original ticket would survive transit to Lotto Central and microfilming. Furthermore, the regulations issued pursuant to section 1604 of the Tax Law explicitly make all "instructions and conditions printed on the ticket" binding on the players (21 NYCRR 2817.17 [b]), and establish as "the sole and exclusive remedy of the player" in any dispute "between the Lottery and/or the contractor and the player" about "whether a ticket is a winning ticket" the decision of the director of the Lottery Division, who in cases of doubt is authorized only to refund the wagered sum (21 NYCRR 2817.11, 2817.13 [b]). Hence the plaintiff's claim for consequential damages representing the prize money must be dismissed, as a matter of law, unless the rigid microfilming requirement, which concededly can only be met with the exercise of care by Games Management *and* the sales agent *as well as* plaintiff, is arbitrary. We agree with the opinion of Justice SIDNEY LEVISS in *Fujishima v Games Mgt. Servs.* (110 Misc 2d 970) that the arguments which have been advanced by disappointed players have failed to demonstrate such arbitrariness. In particular, we note that an affidavit submitted by the Deputy Director for Planning and Operations at the Lottery Division pointed out that the "linchpin" of the Lotto security system was the ironclad microfilming requirement and the liability limitation and that any relaxation of this scheme would dissipate the game's income through litigation and harm its popularity

---

**3.** "2. LOTTO TICKETS NOT VALID UNTIL MICROFILMED AT LOTTO CENTRAL, in accordance with LOTTO rules. Players acknowledge that LOTTO Sales Agents are acting on behalf of the players in validating the LOTTO tickets and returning them to the Contractor acting for and on behalf of the State Lottery. The liability of the Contractor, the State, and the LOTTO Sales Agents is limited to a refund of the amount wagered if a ticket is not accepted by the Contractor on behalf of the State, regardless of whether said liability arises through neglect, omission, failure or otherwise on the part of an Agent or the Contractor."

by impairing the speed and certainty with which prizes were awarded. Moreover, according to the uncontradicted affidavit, every jurisdiction operating a Lotto game like the one involved here has adopted this same inflexible scheme.

We disagree with the contrary rationale put forward in *Leavy v Games Mgt. Serv.* (105 Misc 2d 50) that the exculpatory rules of the Lotto game might encourage misfeasance or fraud by Games Management in operating the game (see *I.C.C. Metals v Municipal Warehouse Co.,* 50 NY2d 657). We perceive no such danger. Plaintiff fails to suggest any motivation for Games Management's alleged nonfeasance or misfeasance. Games Management points out that under its contract with the Lottery Division its financial benefit is based solely upon the gross sales value of the tickets appearing on its microfilm, and it thus has every incentive to accept tickets for microfilming. Insofar as the Lottery Division is concerned, moreover, there is no incentive — except the fear of player fraud — to avoid honoring claims like plaintiff's, since prize money not paid out on one ticket must eventually be paid out on another. It is clear that the liability limitation based on a microfilming requirement is eminently rational.

Having thus concluded that plaintiff's claim for the prize money on her Lotto ticket cannot survive Games Management's summary judgment motion, we must also examine her cause of action for defamation before determining whether the entire complaint should be dismissed.

■ Plaintiff's complaint alleged that employees of Games Management, in effect, accused her of cheating while investigating her claim for payment of the prize money. However, an affidavit from the operation's director specified that he knew of no one who had done such a thing and further noted that the purported Games Management employees identified in plaintiff's bill of particulars were in fact employees of the Lottery Division, not Games Management. Plaintiff's papers in opposition fail to mention the defamation issue, except for a reiteration of the complaint and bill of particulars in an unsworn statement from the sales agent's employee who heard the allegedly defamatory comments.

Accordingly, since plaintiff failed to contradict Games Management's affidavit on the essential issue of the identity of the persons who allegedly defamed her, no issue of fact exists for trial and Games Management is entitled to summary judgment dismissing the cause of action.

Therefore, since plaintiff's claim for the prize money has no basis in law and her claim for defamation fails to raise an issue of fact, the order denying summary judgment to Games Management must be reversed and the motion granted.

WEINSTEIN, J. P., THOMPSON and BOYERS, JJ., concur.

Order of the Supreme Court, Nassau County, dated August 26, 1981, reversed, on the law, appellant's motion for summary judgment is granted and the complaint is dismissed as to the appellant.

Appeal from an order of the same court, dated April 30, 1981, dismissed in light of the determination on the appeal from the order dated August 26, 1981.

Appellant is awarded one bill of $50 costs and disbursements.